**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| HELEN M. LOUK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) NO. 3:14-CV-01602 |
| CAROLYN W. COLVIN, | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits to Plaintiff Helen M. Louk. For the reasons set forth below, the decision of the Commissioner is **AFFIRMED.**

BACKGROUND

On November 10, 2011, Scott Allen Louk ("Louk") filed an application for Social Security Disability Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401, *et seq.* Louk also applied for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. section 1381, *et. seq.* Louk alleged that his disability began on October 11, 2011. The Social Security Administration ("SSA") denied his

1

initial application and also denied his claim upon reconsideration.

Louk requested a hearing, and on January 30, 2013, Louk appeared with his attorney at an administration hearing before Administrative Law Judge ("ALJ") David R. Bruce. Testimony was provided by Louk, his mother, Helen Louk ("Mrs. Louk" or "Plaintiff"), and vocational expert ("VE") Ronald Malik. On February 28, 2013, the ALJ issued a decision denying Louk's claim, finding him not disabled because he was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Tr. 28.)

Louk requested that the Appeals Council review the ALJ's decision, but that request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a). Louk initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g). Louk passed away on June 25, 2014, as a result of a myocardial infarction. (DE# 11.) Thereafter, Mrs. Louk was substituted as the plaintiff in this matter. (DE# 14.)

DISCUSSION

Facts

Louk was born in December 1967, and was 43 years old on the alleged disability onset date of October 11, 2011. (Tr. 135, 142.) He had a high school education. (Tr. 51.) Louk's past relevant work included employment as a pressure tester and a greeter/stocker. (Tr. 43, 64-65.) Louk alleged the following conditions limited his ability to work: a spot on the side of his brain, residuals from a stroke in 2001, extreme aggravation and anxiety, learning disability, loss of coordination and concentration, and a perceptual impairment. (Tr. 173.)

Medical Evidence

The medical evidence can be summarized as follows:

Louk suffered a stroke in 2001. (Tr. 58.) On November 29, 2001, Louk underwent magnetic resonance imaging ("MRI") of his brain. (Tr. 310-11.) The MRI revealed damage to the structures in Louk's brain. (*Id.*)

Nearly a decade later, on July 30, 2011, Louk was taken to the emergency room after a seizure-like episode (syncope) at Wal-Mart, where he worked as a greeter. (Tr. 42, 233, 238.) Louk was prescribed rest but could return to work on August 2, 2011. (Tr. 238.) The emergency room doctor indicated that Louk should

not drive a motor vehicle "for now" and that he should follow up in a few days. (*Id.*)

After Louk applied for DIB and SSI in November 2011, Louk submitted a function report to the state agency. (Tr. 195-202.) Louk indicated that he had no problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, or using his hands. (Tr. 200.) He could walk "as far as needed" without stopping for rest. (Tr. 200.) Louk reported that he lived alone, prepared his own meals (such as frozen dinners), did not have any problems with personal care, and did not need help with household tasks such as laundry and sweeping. (Tr. 195-97.) Louk was able to drive alone, shop for himself, and could pay bills, count change, and handle bank accounts. (Tr. 198.) Louk indicated that he had difficulty with concentration and understanding but no problems with memory, completing tasks, following instructions, or getting along with others. (Tr. 200.)

In November and December 2011, Dr. Frank Choate, Psy.D., conducted a consultative psychological evaluation during which he tested Louk's intelligence, memory, and visual motor skills. (Tr. 278.) Dr. Choate reported that Louk's concentration, persistence and pacing during the interview were noticeably limited. (Tr. 280.) Louk had a full-scale IQ score of 75, which placed him "within the Borderline range of intellectual

functioning." (*Id.*) Louk had a 31-point difference between his Verbal Comprehension Index and his Perceptual Reasoning Index, which was a "significant" finding. (Tr. 283.) Dr. Choate indicated that while Louk's ability to understand or comprehend is in the average range, Louk's ability to explain what he understands is "severely limited." (*Id.*) Louk's Working Memory Index score of 71 placed him in the borderline range. (*Id.*) Louk's score of 65 on the Processing Speed Index placed him within the "Extremely Low" range. (*Id.*) Louk took the Trial Making Test Part B, which 90% of people can complete in less than a minute. (Tr. 282.) Louk worked for three minutes and forty-five seconds before he had to stop due to confusion, having completed only one-fifth of the test. (*Id.*) Dr. Choate noted "indications of problems with fine motor skills" which were likely due to a stroke (Tr. 282), but he did not opine that these indications affected Louk's ability to work. (*See* Tr. 283.)

Dr. Choate diagnosed Louk with a cognitive disorder, learning disorder, and borderline intellectual functioning. (Tr. 283.) He gave Louk a Global Assessment of Functioning ("GAF") of 53, which reflects moderate symptoms or difficulties in social, occupational, or school functioning. (Tr. 283-84.) Dr. Choate found that Louk had "definite memory impairment, both short and long term." (Tr. 283.) Louk's ability to recall things after a 20-30 minute delay was very impaired. (Tr. 282.) According to

Dr. Choate, Louk could learn new things, but it would take repetition and possibly frequent reminders to do so. (*Id*.) He noted that Louk had a "fairly successful work history," and opined that Louk "would do best with simple repetitive work," but could not take on numerous tasks. (Tr. 283-84.) Dr. Choate recommended that Louk be placed in work with simple repetitive steps, and that Louk have a list of duties that he could check off as he completed them, or some manner of reminder. (Tr. 284.) He recommended that an employment specialist assist Louk in finding a job. (*Id*.)

In December 2011, Dr. Stacia Hill, Ph.D., a state agency psychological consultant, reviewed Louk's file and completed forms used for assessing mental impairments. (Tr. 285-301.) Dr. Hill noted that she gave Dr. Choate's medical opinion weight and that it was consistent with other information in the file. (Tr. 301.) Dr. Hill indicated that Louk's mental impairments did not meet or medically equal a listed impairment. (Tr. 286.) She assigned ratings of mild restriction in Louk's activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. 295.)

Dr. Hill concluded that Louk was "Not Significantly Limited" in 18 categories, including remembering and carrying out very

short and simple instructions, remembering locations and work-like procedures, carrying out simple instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, and making simple work-related decisions. (Tr. 299.) She found that Louk was "Moderately Limited" in understanding and remembering detailed instructions and carrying out detailed instructions. (Tr. 299-300.) Dr. Hill explained that "in terms of level of severity of functioning, [Louk's] allegations appear partially credible given adls [activities of daily living] appear wnl [within normal limits] and attention/concentration are moderately impacted but appear reasonable for simple tasks." (Tr. 301.) Dr. Hill opined that Louk could "understand, remember, and carry-out simple tasks," "relate on at least a superficial basis on an ongoing basis with co-workers and supervisors," "attend to task for sufficient periods of time to complete tasks," and "manage the stresses involved with simple work." (*Id*.) William Shipley, Ph.D., a state agency psychological consultant, affirmed Dr. Hill's opinion on January 27, 2012. (Tr. 308.)

On December 27, 2011, Dr. Coulter performed a consultative physical examination on Louk. (Tr. 304-06.) He found no indications of musculoskeletal or neurological problems, and no range of motion limitations. (Tr. 304-05.) Louk had full muscle strength and tone with no atrophy; normal gait; normal standing

static balance; negative supine and seated straight-leg raise tests; normal grip strength; full ability to perform fine and gross movements; and no motor loss. (Tr. 306.) Dr. Coulter opined that Louk could maintain balance during ambulation while carrying objects less than 10 pounds; lift and carry less than 10 pounds and more than that occasionally; and stand or walk 2 hours in an 8 hour day. (*Id.*) He concluded that Louk's "primary disability is learning disability and anxiety secondary to a stroke. He may have problems with learning and retaining information, motivation, concentration, interacting with others." (*Id.*)

On December 30, 2011, state agency medical consultant Dr. Richard Wenzler, M.D., opined that Louk had no severe physical impairments. (Tr. 307.) Dr. Wenzler noted that Louk had a normal gait and neurological exam, no range of motion limits, normal muscle and grip strength, and normal fine finger manipulations. (*Id.*) Dr. M. Brill, M.D., a state agency medical consultant, affirmed Dr. Wenzler's opinion on January 30, 2012. (Tr. 309.)

In March 2012, Louk provided an assessment of his daily functioning indicating that his stroke caused difficulty with motor coordination. (Tr. 218.) He reported that he was unable to cook his own meals and that he relied on his mother for grocery shopping and food preparation. (*Id.*) Louk also claimed

that he could not concentrate, and was irritable due to frustration. (*Id.*)

<u>Vocational Evidence</u>

In May 2010 and December 2011, Louk was referred to Carol McGrew, Job Development Specialist. (Tr. 227.) Ms. McGrew assisted Louk in obtaining a position at Wal-Mart as a freezer food stockman. (*Id.*) In a one-page report, Ms. McGrew stated that Louk "was unable to perform this position at an accurate and fast-paced level" in spite of accommodations and patient managers and supervisors. (*Id.*) Ms. McGrew noted Louk's difficulties with "follow through, memory and speed," and that Louk was unable to maintain employment as a Wal-Mart Greeter because the position required multi-tasking. (*Id.*) According to Ms. McGrew, Louk was discharged because of his "inability to do the jobs." (*Id.*) She opined that Louk had "great difficulty catching on to the different training personalities," which "is a great barrier and will definitely impact future job developments." (*Id.*)

<u>Hearing Testimony</u>

Louk testified that he last worked on October 11, 2011, when he was laid off for being too slow. (Tr. 41-43.) Louk explained that he could not work because he was "too slow" and had difficulty doing a number of different tasks required by employers. (Tr. 50.) Louk testified that he lived in his own place, cleaned, took care of his personal needs, read Stephen King novels, watched television, and visited with friends and family. (Tr. 48-52.) Louk also testified regarding his prior employment. (Tr. 42-46, 53-54.)

Mrs. Louk testified that she saw Louk on holidays and other occasions, and that she spoke with him approximately ten times a day. (Tr. 55.) She testified that he had very poor memory, that his judgment and coordination were impaired, that it was hard for him to learn new things and that he was slow in doing things. (Tr. 55-56.)

After Louk and Mrs. Louk testified, the ALJ asked the VE to consider a hypothetical individual who was the same age as Louk and had the same work experience and education. (Tr. 65.) The VE was asked to assume the following limitations:

> This person is limited to work at all exertional levels. However I would have them not climb ladders, ropes and scaffolds. No exposure to unprotected heights, moving mechanical parts or operating a motor vehicle.

I would limit this person further to simple, routine
and repetitive tasks and not at a production rate pace
like assembly line work but could perform goal oriented
work. This person should also have a list of duties
that can be checked off as the tasks are completed.

. . . I would further limit this person in terms of
interacting with supervisors, they should not have
multiple supervisors. Shouldn't be in a position where
they have to have multiple people checking on them.
Should not have any jobs that require socializing or
bonding with the team in terms of interaction with co-
workers. And any interaction with the public should be
brief and superficial, not an integral part of the job.

(Tr. 65-66.) The VE testified that such a person could not

perform Louk's past work. (Tr. 66.) The VE noted that because

heavier work periodically requires teamwork, the teamwork

limitation would restrict this person to light work. (*Id.*) The

VE opined that the hypothetical person could perform light jobs

in the national economy, such as small product assembler (DOT #

739.687-030); wiring assembler (DOT # 726.684-022); and packager

(DOT # 726.687-038). (Tr. 66-67.)

Louk's counsel asked the VE about the vocational impact of

test scores indicating low processing speeds. (Tr. 68.) The VE

testified that a score of 65 "does not mean that the individual

cannot do routine, repetitive tasks" and that he knew

"individuals with lower processing scores than that, that went

into competitive employment." (Tr. 68.) Louk's counsel also

inquired about the vocational impact of a working memory

composite score of 71. (Tr. 69.) The VE responded that low

processing and memory speeds would make employment "much more difficult" but noted that he "placed individuals with scores lower than that, that maintained a long term employment." (Tr. 69.)

Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id*. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014) (noting "[t]his deferential standard of review is weighted in favor of upholding the ALJ's decision"). In determining whether substantial evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion for the ALJ's by reconsidering the facts or reweighing the evidence. *See Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law *de novo*, and if the ALJ makes an error of law, the Court may reverse without regard to the volume of

evidence in support of the factual findings. *White ex rel. Smith v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB or SSI benefits under the Social Security Act, the claimant must establish that he is disabled. 42 U.S.C. § 423(d)(1)(A) and 1382(a)(1). To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five-step evaluation:

Step 1:   Is the claimant performing substantially gainful activity? If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.

Step 2:   Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to Step 3.

Step 3:   Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to Step 4.

Step 4:   Is the claimant able to perform his past relevant work? If yes, the claim is denied;

> if no, the inquiry proceeds to Step 5, where
> the burden of proof shifts to the
> Commissioner.

> Step 5: Is the claimant able to perform any other
> work within his residual functional capacity
> in the national economy? If yes, the claim
> is denied; if no, the claimant is disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920 (a)(4)(i)-(v);

*see also Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994).

In this case, the ALJ found that Louk had not engaged in substantial gainful activity since October 11, 2011, his alleged onset date. (Tr. 20.) The ALJ found that Louk suffered from the following severe impairments: borderline intellectual functioning, cognitive disorder, and learning disorder (20 C.F.R. §§ 404.1520© and 416.920(c). (*Id.*) The ALJ further found that Louk did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 21.) The ALJ made the following Residual Functional Capacity ("RFC") determination:

> [T]he claimant has the [RFC] to perform a full range of
> work at all exertional levels but with the following
> nonexertional limitations. The claimant should never
> climb ladders, ropes, or scaffolds. The claimant
> should avoid all exposure to unprotected heights and
> moving mechanical parts. The claimant should never
> operate a motor vehicle. The claimant can understand,
> remember, and carry out simple, routine, and repetitive
> tasks and use judgment to make simple work-related
> decisions. The claimant is not able to perform at a
> production rate pace but can perform goal-oriented
> work. The claimant must have a list of duties that he

14

> can check off as the tasks are completed. The claimant
> needs a job that does not have multiple supervisors;
> cannot perform a job that requires socialization or
> bonding with a team; and should have only brief and
> superficial interaction with the public.

(Tr. 22-23.) Based upon Louk's RFC, the ALJ found that Louk was

unable to perform his past relevant work as a greeter/stocker,

pressure tester and die setter. (Tr. 27.) However, the ALJ

found that Louk was capable of performing other work that exists

in significant numbers in the national economy, including work as

a small products assembler, wire assembler, and packager. (Tr.

28.)

Plaintiff believes that the ALJ committed several errors

requiring reversal. First, Plaintiff argues that the Appeals

Council's denial of the request for review is not supported by

substantial evidence. Second, Plaintiff asserts that the ALJ

failed to follow Social Security regulations in evaluating

opinion evidence. Third, Plaintiff claims that the ALJ's RFC

finding is not supported by substantial evidence. Fourth,

Plaintiff argues that the ALJ's finding that Louk was not

entirely credible is not supported by substantial evidence.


Appeals Council's Denial of Request for Review

Plaintiff argues that the Appeals Council's denial of the

request for review is not supported by substantial evidence.

More specifically, Plaintiff claims that Louk's 2001 MRI – which

15

Louk did not present to the ALJ – was important medical evidence. Louk presented the 2001 MRI to the Appeals Council. The 2001 MRI was acknowledged in the Appeals Council's decision, and was added to the record as Exhibit 10F. (Tr. 1-2, 310-11.)[1]

Plaintiff claims that the Appeals Council failed to submit the 2001 MRI to the medical scrutiny it should have, because it was "new and potentially decisive medical evidence." (DE# 15 at 13 (citing *Goins v. Colvin,* 764 F.3d 677, 680 (7th Cir. 2014).) Plaintiff acknowledges that the MRI was "not new in the chronological sense," as it was taken twelve years before the ALJ's decision, but that it was "new to the case." (*Id.*) According to Plaintiff, the MRI is new and material evidence of "multiple vascular distributions" of Louk's brain injury due to his stroke, and should have resulted in a remand to the ALJ for further consideration pursuant to 20 C.F.R. § 405(g). (*Id.* at 13-14.)

The Commissioner responds that the Appeals Council correctly determined that the 2001 MRI did not render the ALJ's decision contrary to the weight of the evidence, and properly denied Louk's request for review. The regulation governing Appeals Council review provides that:

---

[1] Plaintiff maintains that the ALJ was "playing doctor" when he noted there was "very little medical evidence in the record," and "assumed that there is medical treatment for Mr. Louk's condition." (DE# 15 at 12.) Plaintiff's argument is without merit. The ALJ's decision does not assert that treatment exists for Louk's condition. Rather than making an independent medical finding, the ALJ merely stated a fact about the record before him.

>If new and material evidence is submitted, the Appeals
>Council shall consider the additional evidence only
>where it relates to the period on or before the date of
>the [ALJ] hearing decision.  The Appeals Council shall
>evaluate the entire record including the new and
>material evidence submitted if it relates to the period
>on or before the date of the [ALJ] hearing decision.
>It will then review the case if it finds that the
>[ALJ]'s action, findings, or conclusion is contrary to
>the weight of the evidence currently of record.

20 C.F.R. § 404.970(b).  A district court's review of "whether the Council made an error of law in applying this regulation is *de novo*.  In the absence of any such error, however, the Council's decision whether to review is discretionary and unreviewable."  *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997) (citations omitted).

Under this regulation, the first step is for the Appeals Council to determine whether the additional evidence relates to the appropriate time period, and is really "new" and "material."  *See id*.  If the evidence is qualifying, the Appeals Council proceeds to the second step, to evaluate the entire record including the new and material evidence.  If the Council concludes that the ALJ's action "appears to be contrary to the weight of the evidence 'currently' of record — that is, the old evidence plus the new submissions — only then does it proceed to a full review of the case."  *Id*.

When the Appeals Council finds post-decision evidence to be "new, material, and relates to the period at issue, but does *not*

provide a basis for granting review," it is to follow the procedure set forth in section I-3-5-20(B) of the Hearings, Appeals and Litigation Law Manual ("HALLEX"). HALLEX I-3-5-20(B) (emphasis added). This procedure calls for the Appeals Council to designate the additional evidence as an exhibit, and explain in the denial notice that the evidence did not provide a basis for granting review. *Id.; see Brown v. Colvin*, No. 1:14-cv-01797, 2015 WL 3886029, at *13 (S.D. Ind. June 22, 2015) (explaining that if the ALJ's action is not contrary to the weight of the evidence, then the Appeals Council prepares a denial notice and the review ceases); *cf.* HALLEX I-3-5-20(A) (providing that additional evidence that the Appeals Council determines is not new, material, or related to the period at issue shall not be designated as an exhibit).

In this case, the Appeals Council added the 2001 MRI as an exhibit to the record, and stated in part: "In looking at your case, we considered . . . the additional evidence . . . [and] found that this information does not provide a basis for changing the [ALJ's] decision." (Tr. 1-2; *see* Tr. 4, 310-11.) While the Seventh Circuit has held that this language "is not as clear as it might be," *Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012), the Court finds that HALLEX I-3-5-20(B) resolves any ambiguity in the Appeals Council's order. By designating the 2001 MRI as an exhibit and adding it to the administrative

18

record, the Appeal Counsel indicated its conclusion that Louk satisfied the first step, that is, that the 2001 MRI related to the proper time period and was new and material. *See Pottorff v. Colvin*, No. 1:13-CV-931, 2014 WL 4636538, at *5 (S.D. Ind. Sept. 16, 2014) ("[T]he Appeals Council's decision to add the evidence to the exhibit list itself demonstrates that it considered the evidence to be new material and time relevant."); *Brown*, 2015 WL 3886029, at *14. "This, in turn, implies that the Council did proceed to the second step of its analysis." *Id.* While the Appeals Council accepted the 2001 MRI as qualifying evidence, at step two, it found this evidence insufficient to require a different result. *See id.* at *16 (where Appeals Council designated the new evidence as an exhibit and added it to the record, "the Appeals Council did in fact conclude that the newly submitted evidence was qualifying . . . [and] *must* have proceeded to the second step") (emphasis in original; citations omitted).

The Appeals Council's decision to deny review, as opposed to refuse to consider additional evidence, is within the discretion of the Appeals Council, and is not subject to review by this Court. *See Perkins*, 107 F.3d at 1294; *Brown*, 2015 WL 3886029, at *14 ("[A] district court cannot review the Appeals Council's

decision at step two.") (citation omitted). Therefore, the Court cannot remand on the basis of the Appeals Council's decision.[2]

The Commissioner also maintains that even if the Appeals Council found that the 2001 MRI was non-qualifying at step one, the error was harmless because the Appeals Council could not reasonably find that the 2001 MRI rendered the ALJ's decision contrary to the weight of the evidence. The Court agrees. Any error was not prejudicial because the 2001 MRI does not undermine the ALJ's finding about Louk's ability to work after he suffered a stroke:

> After the claimant's stroke, [he] was able to work for Fulton Industries for seven years as a pressure tester. This work was semi-skilled (SVP3) at the heavy exertional level. The claimant testified that he did a good job and did not have a problem there until he was moved to another part of the factory with a different boss. The fact [he] was able to perform such work after his stroke strongly suggests that the residuals of his stroke would not currently prevent work.

(Tr. 25.) The 2001 MRI results do not indicate any work-related limitations of function. *See Klahn v. Colvin,* No. 13-165, 2014 WL 841523, at *12 (E.D. Wis. Mar. 4, 2014) (noting that a

---

[2] Plaintiff argues in passing that the Court should remand this case pursuant to sentence six of 42 U.S.C. § 405(g). (DE# 15 at 14.) This sentence allows the Court to remand the case "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" 42 U.S.C. § 405(g). For sentence six purposes, "new" means evidence "not in existence or available to the claimant at the time of the administrative proceeding." *Perkins*, 107 F.3d at 1296 (citations omitted). Plaintiff submitted the 2001 MRI to the Appeals Council. The evidence existed at the time of the "administrative proceeding," and accordingly is not "new" for the purposes of sentence six. *See DeGrazio v. Colvin*, 558 F. Appx. 649, 652 (7th Cir. 2014) ("The evidence . . . was not new for purposes of sentence six because it already had been presented to the Appeals Council.").

degenerative disease identified on an MRI "does not by itself show functional limitation or pain."). Louk worked for seven years after his stroke, and did not proffer medical evidence that his brain functioning had deteriorated in the interim. *See Warren v. Colvin*, 565 Fed. Appx. 540, 544 (7th Cir. 2014) (noting "intellectual abilities are generally presumed to remain stable over time"). The Court finds that the 2001 MRI did not make the ALJ's decision contrary to the weight of the evidence. Therefore, the Appeals Council did not harmfully err in denying Louk's request for review of the ALJ's decision.


ALJ's Evaluation of Opinion Evidence

Plaintiff argues that the ALJ failed to consider the factors set forth in 20 C.F.R. section 404.1527© when weighing the medical opinions of the examining and non-examining physicians in this case. Pursuant to 20 C.F.R. section 404.1527(c)(1), the opinions of examining physicians are entitled to greater weight than those of non-examining physicians. While an ALJ generally affords "more weight to the opinion of a source who has examined a claimant than to the opinion of a source who has not, the weight ultimately given to that opinion depends on its consistency with and objective medical support in the record; the quality of the explanation the source gave for the opinion; and the source's specialization." *Givens v. Colvin,* 551 Fed. Appx.

855, 860 (7th Cir. 2013) (internal quotation omitted). An ALJ may discount even a treating physician's opinion if it is inconsistent with the medical record. *See* 20 C.F.R. § 404.1527(c)(2), (4) (medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence).

## Dr. Coulter

Plaintiff argues that the ALJ did not afford the opinion of examining physician Dr. Coulter sufficient weight. Dr. Coulter opined that Louk was able to maintain balance during ambulation while carrying objects weighing less than ten pounds; was able to lift and carry less than ten pounds or over ten pounds occasionally; and was able to stand/walk two hours in an eight-hour workday. (Tr. 21, 306.) The ALJ afforded Dr. Coulter's opinion little weight because these limitations "are not consistent with [Louk's] normal examination." (Tr. 21.) During Dr. Coulter's examination, Louk "had a normal gait; a normal neurological examination; and full range of motion in all joints" and "was able to perform fine and gross movements and his muscle strength was grossly normal." (*Id.; see* Tr. 304-06.) The Court finds that the ALJ properly gave Dr. Coulter's opinion little weight because it was not well supported by his physical examination of Louk. *See, e.g., Davis v. Colvin*, No. 1:13-cv-01694, 2015 WL 224767, at *8 (S.D. Ind. Jan. 15, 2015)

(concluding that "the ALJ properly gave the report little weight because [examining physician's] conclusions were not well supported by other evidence in the record"); *Schrader v. Colvin,* No. 13–2101, 2014 WL 4375930, at *3 (C.D. Ill. Sept. 4, 2014) (approving ALJ's decision to give little weight to examining physician's opinion that was inconsistent with "normal findings on examination" and "other evidence of record").

## Drs. Wenzler and Brill

Non-examining medical consultant Dr. Wenzler determined that Louk was not severely physically limited, and Dr. Brill concurred with Dr. Wenzler's opinion. (Tr. 21, 307, 309.) The ALJ afforded great weight to these opinions because they were consistent with Louk's medical records, Dr. Coulter's objective findings of a normal examination, and Louk's testimony. (Tr. 21.) Plaintiff claims that these opinions are not consistent with this evidence, but points to no evidence or testimony in the record indicating that Louk had any severe physical limitation. (DE# 15 at 15-16.) As such, the Court finds that the ALJ did not err in affording great weight to these opinions.

Dr. Choate

Dr. Choate administered several psychological tests and performed a psychological evaluation of Louk. The ALJ found that Dr. Choate "was not a treating physician" and "afforded some weight" to his opinion. (Tr. 26.) Plaintiff claims that the ALJ erred by not affording greater weight to Dr. Choate's opinion and objective test results, and by failing to evaluate Dr. Choate's objective medical evidence as required by regulations. *See* 20 C.F.R. § 404.1529(c)(2) ("we will consider [objective medical evidence] in reaching a conclusion as to whether you are disabled"). But the ALJ did consider Louk's low scores from the tests administered by Dr. Choate. (*See, e.g.,* Tr. 24-25 (addressing Louk's scores from Weschler Adult Intelligence Scale-IV test, full-scale IQ test, and Weschler Memory Scale-IV test).) While Dr. Choate concluded that Louk's ability to recall things after a 20-30 minute delay was very impaired, he believed that Louk could learn with repetition and frequent reminders. (Tr. 24); *see Novy v. Astrue*, 497 F.3d 708, 709-10 (7th Cir. 2007) (noting "persons with an IQ in the 60s (or even lower) may still be able to hold a full-time job"). Dr. Choate opined that Louk would do best with simple repetitive work and not take on numerous tasks, since learning is "excruciatingly difficult" for him, and suggested that his jobsite provide a list of duties for Louk. (Tr. 26.) The ALJ incorporated Dr. Choate's

recommendations into Louk's RCF assessment. (*See, e.g.,* Tr. 23 (incorporating lists of duties Louk can check off as tasks are completed into RFC), 26 (acknowledging the incorporation of Dr. Choate's suggestions).) As such, the Court finds that the ALJ did not err in affording Dr. Choate's opinion some weight.

Drs. Hill and Shipley

Plaintiff also argues that the ALJ erred by affording the opinions of non-examining psychological consultants Dr. Hill and Shipley substantial weight. An ALJ may "give substantial weight to the testimony of a medical advisor even though the advisor has not examined the claimant personally," so long as that determination is supported by substantial evidence. *DeFrancesco v. Bowen*, 867 F.2d 1040, 1043 (7th Cir. 1989) (citation omitted); *see Ketelboeter v. Astrue*, 550 F.3d 620, 624-25 (7th Cir. 2008) (affirming decision to give more weight to opinions of non-examining medical experts than treating physician because substantial evidence supported ALJ's decision). Evidence is substantial if it is "sufficient for a reasonable person to accept as adequate to support the decision." *Ketelboeter*, 550 F.3d at 624 (citation omitted).

Here, Dr. Hill reviewed the file and determined that Louk can "understand, remember and carry-out simple tasks"; "relate on at least a superficial basis on an ongoing basis with co-workers

and supervisors"; "attend to task for sufficient periods of time to complete tasks"; and "manage the stresses involved with simple work." (Tr. 301; *see* Tr. 26.) Dr. Shipley affirmed Dr. Hill's opinion without comment. (Tr. 308.) The ALJ afforded substantial weight to these opinions, noting that while they were from non-examining and non-treating expert sources, they were consistent with the record as a whole and based on their detailed knowledge of the standard of disability as set forth by the Commissioner. (Tr. 26.)

Plaintiff argues that while Dr. Hill's report claims to give weight to Dr. Choate's report, she misstates the test results, and her conclusions differ from Dr. Choate's test results. Plaintiff asserts that Dr. Hill's summary conclusions indicate that Louk's mental condition was less severe than Dr. Choate's test results. For example, Dr. Hill's conclusion that Louk was "not significantly limited" in several areas of mental ability appears to contrast with Dr. Choate's test results showing "substantial weaknesses in multiple areas," "definite memory impairment," and "noticeably limited" concentration. (*Compare* Tr. 299 *with* Tr. 281-283.)

However, Dr. Hill's conclusions were not based solely on Dr. Choate's report, but rather, were "derived from the evidence in the file." (Tr. 299.) Dr. Hill noted that Dr. Choate's *medical opinion* was consistent with other information in the file, and

that she agreed with Dr. Choate's *medical opinion.* (Tr. 301.)
The medical opinions of Drs. Hill and Choate appear consistent.
After interviewing Louk, administering tests, and considering
Louk's low test scores, Dr. Choate did not opine that Louk was
unable to work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §
12.00(D)(6)(a) (noting that intelligence tests "are only part of
the overall assessment," and that a narrative report should
comment on whether the scores are consistent with the claimant's
"degree of functional limitation"). Rather, Dr. Choate's report
indicates that while Louk had memory issues, he was able to do
simple tasks with certain limitations. He opines that "[d]ue to
his memory issues, [Louk] would do best in a job which had simple
repetitive steps." (Tr. 284.) Dr. Hill similarly opined that
Louk's "attention/concentration are moderately impacted but
appear reasonable for simple tasks." (Tr. 301.) The Court finds
that the ALJ did not err in affording the opinions of Drs. Hill
and Shipley substantial weight.


ALJ's RFC Finding

In making an RFC finding, the ALJ must describe why a
claimant's reported limitations were inconsistent with the
evidence in the record. *See* SSR 96-8p; *Pepper v. Colvin,* 712
F.3d 351, 363 (7th Cir. 2013) (noting "an ALJ's adequate
discussion of the issues need not contain a complete written

evaluation of every piece of evidence"). The ALJ must build the necessary "'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (citation omitted). Moreover, the ALJ must orient the VE to the totality of the claimant's limitations. *O'Conner-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).

Here, the ALJ found that Louk had the RFC to perform a full range of work at all exertional levels. (Tr. 22-23.) Plaintiff argues that the RFC assessment is erroneous because the ALJ did not consider the conflict in the medical evidence regarding Louk's fine motor skills. Specifically, Dr. Choate noted "indications of problems with fine motor skills, . . . likely due to [Louk's] stroke" during his psychological examination (Tr. 282), while examining physician Dr. Coulter indicated that Louk was "able to perform fine and gross movements. No motor loss." (Tr. 306; *see also* Tr. 307 (Dr. Wenzler's opinion of "normal fine finger manipulation").) The ALJ's decision does not address Dr. Choate's notation, or the apparent conflict between these opinions. "[A]n ALJ is not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence." *Pepper*, 712 F.3d at 363. Plaintiff fails to point to any other medical evidence or testimony indicating that Louk had problems with his fine motor skills, or that such problems contributed to his

28

alleged inability to work. Given the dearth of evidence on this issue, the Court finds any error in failing to address this apparent conflict was harmless. *See Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir. 2010) (error is harmless "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record").

Plaintiff also argues that the ALJ should have credited Dr. Coulter's opinion that Louk was able to "lift/carry less than 10 pounds or over 10 pounds occasionally" and "stand/walk 2 hours in an 8 hour day." (Tr. 306.) While the ALJ's RFC assessment indicated that Louk could work at all exertional levels, the ALJ's Step Five decision was based on the VE's testimony that a hypothetical person with Louk's impairments could perform the requirements of "unskilled light occupations" such as small product assembler, wiring assembler and packager. (Tr. 28.) "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Because the representative occupations adopted by the ALJ incorporate Dr. Coulter's limitations for lifting and carrying, the Court finds that any error in failing to limit Louk's RFC to light work is harmless. *See Plant v. Colvin,* No. 2:13-CV-489, 2015 WL 1931337, at *9 (N.D. Ind. Apr. 28, 2015) (any error in articulating the RFC was

harmless where the VE identified jobs for someone with claimant's RFC that could also be performed by someone with additional limitations posed by claimant).

Regarding Dr. Coulter's standing and walking limitation of two hours, the ALJ afforded Dr. Coulter's opinion little weight because the limitations were inconsistent with Louk's "normal examination." (Tr. 21.) According to Dr. Coulter's examination report, Louk had a normal gait, full range of motions in all joints, was able to perform fine and gross movements and his muscle strength was grossly normal. (*Id.*; *see* Tr. 304-06.) The report does not indicate why Louk's standing and walking should be limited. An ALJ is entitled to discount an opinion where the source "did not explain his opinion and his treatment notes do not clarify the doctor's reasoning." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *see Henke v. Astrue*, 498 F. Appx. 636, 640 n.3 (7th Cir. 2012) (finding it "is enough" for the ALJ to note the lack of medical evidence supporting an opinion and its inconsistency with the rest of the record). The ALJ did not err in determining that Dr. Coulter's conclusions regarding Louk's ability to stand and walk were unsupported.[3]

---

[3] Plaintiff's reply brief introduces a new argument, contending that the ALJ's RFC is erroneous because he failed to incorporate the opinion of Carol McGrew, job development specialist. This argument is waived because it was not raised in the opening brief. *See Young v. Colvin*, No. 1:13-cv-01602, 2015 WL 1190095, at *7 n.5 (S.D. Ind. Mar. 13, 2015); *Citizens Against Ruining the Env't v. EPA,* 535 F.3d 670, 675 (7th Cir. 2008) ("It is improper for a party to raise new arguments in a reply because it does not give an adversary adequate opportunity to respond.") Even so, the argument lacks merit. The ALJ "considered Ms. McGrew's opinion valuable and incorporated her perceived

Plaintiff claims that the ALJ's finding that Louk was not entirely credible is not supported by substantial evidence. Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is "patently wrong." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). However, the ALJ must articulate specific reasons for discounting a claimant's testimony as being less than credible, and cannot merely ignore the testimony or rely solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility determination. *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005). The ALJ must make a credibility determination supported by record evidence and be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight given to the claimant's statements and the reasons for that weight. *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

In evaluating the credibility of statements supporting a Social Security Application, the Seventh Circuit has noted that an ALJ must comply with the requirements of Social Security Ruling 96-7p. *See Steele,* 290 F.3d at 942. This ruling requires ALJs to articulate "specific reasons" behind credibility

limitations" into Louk's RFC. (Tr. 27.)

evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p. Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effect of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . ; and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; *see Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003).

Plaintiff argues that the ALJ rendered an improper credibility determination by using "meaningless boilerplate." The ALJ used some template language in initially assessing Louk's credibility, stating:

> the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Tr. 24.) Almost identical language was used and criticized in *Bjornson v. Astrue,* 671 F.3d 640, 644-45 (7th Cir. 2012). However, the use of boilerplate language, by itself, does not require remand. *See Adams v. Astrue*, 880 F. Supp. 2d 895, 906-07 (N.D. Ill. 2012) (finding reversal was not warranted where the ALJ provided further explanation as to why the claimant's alleged limitations were not supported by the record).

Here, the ALJ considered the factors required by SSR 96-7P and found that some of Louk's allegations were not entirely credible. The ALJ addressed Louk's hearing testimony as well as his reports regarding his daily activities. (Tr. 23.) At the hearing, Louk testified that he lives alone, can make cake from a box and pizza, watches television, and reads Stephen King novels. (*Id.*, Tr. 25.) In a written report, Louk claimed that he was unable to cook meals and depends on his mother for grocery shopping and preparing meals. (Tr. 23.) Louk also reported that

he was unable to concentrate fully, and becomes aggravated easily because he was unable to complete actions. (*Id.*) Louk testified that he cannot work because he is too slow and cannot multi-task. (*Id.*)

The ALJ noted that Louk was taking several medications that effectively control his headaches and hypertension and regulate his blood, and that Louk testified that he felt well and was without pain. (Tr. 24.) The ALJ recounted the July 2011 incident in which Louk fainted at work and was taken to the emergency room, noting that Louk was discharged after three hours, and instructed that he could return to work. (*Id.*) The ALJ also addressed the psychological evaluation by Dr. Choate, describing Dr. Choate's observations and diagnosis, as well as Louk's scores on various tests. (Tr. 24-25.)

The ALJ considered Louk's employment after his stroke in 2001, and determined that Louk's ability "to perform such work after his stroke strongly suggests that the residuals of his stroke would not currently prevent work." (Tr. 25.) The ALJ also considered that Louk collected unemployment benefits after he stopped working at Wal-Mart. (*Id.*) Finally, the ALJ found that Louk's ability to perform a significant number of daily activities suggested that he was capable of simple repetitive work. (Tr. 25.)

Although the ALJ may have used some template language, the substance of the decision supports his credibility determination. The ALJ sufficiently analyzed and explained his credibility determination, citing evidence in the record. *See Plant*, 2015 WL 1931337, at *7 (refusing to remand where the ALJ analyzed claimant's statements and the evidence in weighing claimant's credibility). Therefore, the Court cannot say that the credibility determination was "patently wrong." *See Skarbek*, 390 F.3d at 504; *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("an ALJ's credibility assessment will stand as long as there is some support in the record") (quotation and brackets omitted).

Plaintiff asserts that the ALJ erred by discounting Louk's credibility because he worked for seven years after his stroke. Plaintiff points out that Louk was required to have been employed in order to qualify for benefits, and that a claimant who pushes himself to work despite his limitations is not precluded from later establishing that he is disabled. But Louk alleged that his symptoms stem from his stroke in 2001, and failed to proffer any evidence that his brain deteriorated thereafter. *Cf*. *Warren,* 565 Fed. Appx. at 544 ("[I]ntellectual abilities are generally presumed to remain stable over time."). The ALJ relied upon Louk's hearing testimony that he did a good job after his stroke and did not have a problem there until he moved to another part of the factory with a different boss. (Tr. 25.) Given Louk's

testimony and the lack of evidence of deterioration of his mental functioning after the stroke, the ALJ reasonably concluded that "the residuals of his stroke would not currently prevent work." (*Id.*)

Plaintiff also argues that the ALJ improperly discounted Louk's credibility because he collected unemployment benefits after he stopped working for Wal-Mart. The ALJ noted the inconsistency between holding oneself out as ready, able, and willing to work, and claiming an inability to work full-time. (*See id.* (citing *Schmidt*, 395 F.3d at 746).) Plaintiff acknowledges that ALJs are permitted to give some consideration to such activity, but insists that the ALJ did not give this determination "significant care and circumspection." (DE# 15 at 22 (citing *Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014)).) Plaintiff claims that Louk's collection of unemployment benefits does not contradict his disability application because he was slow to reach the conclusion that he was unable to work. *See Scrogham*, 765 F.3d at 699 ("In the case of a progressive disease, it is especially possible that an applicant might, at the early stages of the disease's manifestation, be unsure of the limits of his physical capabilities and only later determine that his inability to find work.").

"[T]here is a contradiction between claiming one is able to work and claiming one is unable to work, and if there is an

exception to that apparent contradiction it seems incumbent on the claimant to make that exception clear, as opposed to simply relying on the fact that, in the abstract, exceptions do exist." *Roovers v. Colvin*, No. 14–C–370, 2015 WL 347749, at *4 (E.D. Wis. Jan. 26, 2015). As noted above, Louk testified that he did a good job for several years after his stroke, and Plaintiff points to no evidence indicating that Louk's mental condition was deteriorating over time. *See Stevens v. Colvin*, No. 1:13–cv–1725, 2014 WL 5704728, at *5 (S.D. Ind. Nov. 5, 2014) (affirming credibility finding where claimant received unemployment benefits and there was "no evidence of significant deterioration in [claimant's] medical condition after he stopped working in 2009"). The Court finds the ALJ did not err in considering Louk's collection of unemployment benefits as "one of many factors" in assessing Louk's credibility. (Tr. 25.)

Finally, Plaintiff argues that the ALJ improperly questioned Louk's credibility because he was able to perform a significant number of daily activities where he "lives alone, maintains his own apartment, prepares his own meals, can follow television programming and reads Stephen King novels." (Tr. 25.)[4] Plaintiff maintains that these activities do not equate with an

---

[4] While Plaintiff asserts that Louk did not testify that he prepared his own meals, other evidence in the record reflects that Louk did so. (*See* Tr. 197 (self-reporting that Louk prepared his own meals a daily basis)). Plaintiff also points to the ALJ's remark at the hearing that Louk "may be overestimating his ability, I don't know." (Tr. 62.) When viewed in context, it appears that the ALJ's remark was merely a response to Mrs. Louk's testimony that Louk never made a cake from a box mix at her house. (*See id.*)

ability to maintain regular employment. *See Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004). However, an ALJ may "consider whether the claimant's daily activities are inconsistent with [his] stated inability to work." *Oakes v. Astrue*, 258 Fed. Appx. 38, 43 (7th Cir. 2007) (citation omitted). This was not a matter of the ALJ concluding that Louk was able to perform full-time work because he periodically engaged in certain daily activities. Here, the ALJ noted that the significant number of daily activities performed by Louk indicated that he was "capable of simple repetitive work." (Tr. 25.) The ALJ also relied on medical evidence and opinions to support his conclusion. *See Engle v. Colvin*, No. 1:13-cv-339, 2014 WL 6977691, at *9 (N.D. Ind. Dec. 9, 2014) (affirming ALJ's decision where ALJ relied on several factors to support credibility determination). Even if the ALJ misconstrued the evidence of Louk's daily activities, the other evidence on which he relied was sufficient to support the conclusion that Louk's complaints were not entirely credible. *See Everaert v. Barnhart,* No. 03-C-0358-C, 2004 WL 1446173, at *5 (W.D. Wis. Jun. 4, 2004) (affirming ALJ's decision where ALJ relied on evidence other than daily activities to support credibility determination). Plaintiff has not demonstrated that the ALJ's decision regarding Louk's credibility was patently incorrect. The ALJ's credibility

determination, which is entitled to special deference, is affirmed.

CONCLUSION

For the reasons set forth above, the decision of the Commissioner is **AFFIRMED**.

DATED:     July 29, 2015         /s/ RUDY LOZANO, Judge
                                  **United States District Court**